IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

A.T. MASSEY COAL COMPANY,　　　*
INC., *et al.*,

　　　　　　　　　　　　　　　　*

　　　　　　　　Plaintiffs,

　　　　　　　　　　　　　　　　*

　　　vs.

　　　　　　　　　　　　　　　　*　　Civil No.:  RDB 03-3389

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL　　　　*
SECURITY, *et al.*,

　　　　　　　　　　　　　　　　*

　　　　　　　　Defendants.

　　　　　　　　　　　　******

## <u>MEMORANDUM OPINION</u>

Pending before this Court are cross motions for summary judgment filed by Plaintiffs A.T.

Massey Coal Company, Inc., *et al.*, ("Plaintiffs" or "Assigned Operators") and Defendant Jo Anne B.

Barnhart ("Barnhart" or "Commissioner"), Commissioner of the Social Security Administration ("SSA")

and Defendants Michael H. Holland, William P. Hobgood, Marty D. Hudson, Thomas O.S. Rand,

Elliot A. Segal, Carl E. Van Horn, and Gail R. Wilensky, who are Trustees of the United Mine

Workers of America Combined Benefit Fund (collectively "Trustees").[1]  Plaintiffs comprise 118

---

[1] This case was transferred from the United States District Court for the Northern Dsitrict of Alabama.  *See A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290 (N.D. Ala. 2003).  In addition, a second related case was transferred from the United States District Court for the District of Columbia.  *See Holland v. A.T. Massey Coal*, 360 F. Supp. 2d 72 (D.D.C. 2004).  This related case, *Holland v. A.J. Taft Coal Co.*, Civ. No. RDB-04-679 ("*Holland II*"), which was filed by the Trustees, is pending against only those coal operators (who are not parties in the instant action) that failed to answer the Trustees' complaint and have not otherwise entered an appearance in the litigation.  This Court approved the approach outlined in the parties' Planning Report for the instant litigation, which stated that "this case, rather than *Holland II*, should be the vehicle for resolving their dispute concerning the proper meaning of the Coal Act's premium determination."  (Paper Nos. 120 & 121.)

companies assigned responsibility by the SSA to pay annual premiums to the United Mine Workers of America Combined Benefit Fund ("Combined Fund") according to the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act"), 26 U.S.C. §§ 9701 *et seq.*  On April 15, 2004, Plaintiffs filed a second amended complaint ("Second Amended Complaint") against Defendants Barnhart and Trustees seeking injunctive and declaratory relief: (1) concerning the correct premium amount the Commissioner of the SSA is required to calculate and that the Plaintiffs are obliged to pay; and (2) to recover amounts owed to them due to the  supposed unlawful premiums set by the Commissioner.  Plaintiffs' Second Amended Complaint seeks review of a two-tiered premium approach that was adopted by the Commissioner in 2003, which requires some coal operators to pay higher health care premium rates for retired workers and their dependents than those paid by other coal operators.

On November 22, 2004, Plaintiffs filed a Motion for Summary Judgment on Counts One and Two of their Second Amended Complaint.  On January 21, 2005, Defendant Barnhart and Defendant Trustees filed separate Cross Motions for Summary Judgment on Counts One and Two.  Count One of the Second Amended Complaint alleges that the Commissioner's June 10, 2003 decision ("2003 Premium Decision") altered the method used by the Commissioner to calculate annual premiums from 1995 to 2003 and in doing so violated the plain language of the Coal Act, 26 U.S.C. § 9704(b)(2)(A).  Count Two of the Second Amended Complaint claims that the 2003 Premium Decision violated the Administrative Procedure Act ("APA"), in particular 5 U.S.C. § 706(2)(A), because the 2003 Premium Decision was arbitrary and capricious and not in accordance with the law.

In sum, the pending motions for summary judgment focus on the interpretation and application of the term "**reimbursements**" as it is used in 26 U.S.C. § 9704(b)(2)(A) of the Coal Act.  Earlier

premium decisions have faced similar challenges in federal courts in two other districts, the Northern District of Alabama (*National Coal Ass'n v. Shalala*, No. CV-94-H-780-S, 1995 U.S. Dist LEXIS 21116 (N.D. Ala. June 2, 1995), *aff'd sub nom. National Coal Ass'n v. Chater*, 81 F.3d 1077 (11th Cir. 1996) (summary judgment decisions)) and the District of Columbia (*Holland v. Apfel*, 96-9744 (CKK), 2000 U.S. Dist. LEXIS 6134 (D.D.C. Feb. 25, 2000), *aff'd in part*, *rev'd in part sub nom. Holland v. National Mining Ass'n.*, 309 F.3d 808 (D.C. Cir. 2002) (summary judgment decisions)).  Both the prior premium decisions and the outcomes of the earlier court challenges, which are discussed below, are central in understanding the development of the two-tiered structure established in the 2003 Premium Decision.  The 2003 Premium Decision states, in relevant part:

> Accordingly, for the determination letter for the plan year beginning October 1, 2003, we intend to provide two per-beneficiary premium calculations.  The higher amount will represent a calculation based on the initial interpretation of the term "reimbursement."  We believe that this interpretation is consistent with the text and structure of the Coal Act as a whole and represents a permissible construction of the statute's plain language of the term "reimbursement."  The lower amount will represent a calculation consistent with the interpretation established in <u>National Coal</u>.

 (*See* Pls' Mem. Summ. J. Ex. 10 at 2, "2003 Premium Decision".)

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 26 U.S.C. § 9721 (the Coal Act), and 29 U.S.C. § 1451 (ERISA).  The issues have been fully briefed and no hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2004).  For the reasons stated below, the Plaintiffs' Motion for Summary Judgment on Counts One and Two is GRANTED,  Defendant Barnhart's Motion for Summary Judgment on Counts One and Two is DENIED, and Defendant Trustees' Motion for Summary Judgment on Counts One and Two is DENIED.

FACTUAL AND PROCEDURAL HISTORY

I.       History and Structure of the Coal Act

For well over seventy years, the employers of the coal mining industry and the United Mine Workers of America ("UMWA"), an organization representing coal miners, have disputed the extent of employee benefits provided to coal miners.  Much of this lengthy history is described in a variety of cases, including *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 444-45 (2002), *Eastern Enters. v. Apfel*, 524 U.S. 498, 498 (1998), and *United Mine Workers of America Health & Ret. Funds v. Robinson*, 455 U.S. 562, 566 (1982).  In the late 1980's, then-Secretary of Labor, Elizabeth Dole, created the Advisory Commission on United Mine Workers of America Retiree Health Benefits ("Coal Commission") to ensure health benefits for over 120,000 individuals.  *See Sigmon Coal Co.*, 534 U.S. at 444-45.  The purpose of the Coal Commission was to study the retiree health care crisis and advise Congress as to possible funding plan options, as there were numerous problems with the benefit plans then in place.  *See generally id.*       After being presented with the Coal Commission's findings and undertaking its own examination, Congress passed the Coal Industry Retiree Health Benefit Act of 1992, Pub. L. No. 102-486, §§ 19141-19143, 106 Stat. 3036, 3056 (codified at 26 U.S.C. §§ 9701-22; 30 U.S.C. § 1232(h)) ("Coal Act"), which is the subject of this litigation.  The Coal Act combined the previous benefit plans into a new mutiemployer plan entitled the "United Mine Workers of America Combined Fund" ("Combined Fund").  *See* 26 U.S.C. § 9702.  The Combined Fund is financed by coal operators and is to provide health benefits to UMWA retirees, their dependents who were eligible to receive benefits from UMWA Plans on July 20, 1992.  *See* 26 U.S.C. § 9703(f); (Pls.' Mem. Summ. J. at 2.)  Additionally, the Combined Fund collaborated with Medicare to provide health

care benefits to eligible Medicare recipients.

The four main parties currently involved in the Combined Fund are: (1) the group of current or retired coal miners and their dependents; (2) the Commissioner of the Social Security Administration, who is charged with calculating the per beneficiary premium each coal operator must pay;[2] (3) the Trustees who are required to collect premiums and administer the Combined Fund; and (4) the coal operators that are required to pay annual premiums to the Trustees as calculated by the Commissioner.

II.    Calculation of Health Benefit Premiums Under the Coal Act

   A.    Calculating Health Benefits Premium

Calculating the premium to be paid by the coal operators under the Coal Act is governed by 26 U.S.C. § 9704(b)(2)(A), which states:

> (2) **Per beneficiary premium.**-The Commissioner of Social Security shall calculate a per beneficiary premium for each plan year beginning on or after February 1, 1993, which is equal to the sum of-
>
> (A) the amount determined by dividing -
>
> (i) the aggregate amount of payments from the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan for health benefits (less reimbursements but including administrative costs) for the plan year beginning July 1, 1991, for all individuals covered under such plans for such plan year, by

---

[2] The Secretary of Health and Human Services ("Secretary") was initially granted the authority by Congress to calculate the per beneficiary premium each coal operator must pay. *See* 26 U.S.C. § 9704(b)(2).  However, the Program Improvement Act of 1994, Pub. L. No 103-296, § 108(h)(9)(A), 108 Stat. 1481, 1487 (codified at 26 U.S.C. §§ 9704(b)(2), 9704(h)), amended the Coal Act by substituting the Secretary of Health and Human Services with the Commissioner of the Social Security Administration. This opinion will use "Secretary" for events before March 31, 1995 and  "Commissioner" for events on March 31, 1995 to present.

(ii) the number of such individuals . . .

The first plan year of the Combined Fund was February 1, 1993 to September 30, 1993.  Each

subsequent plan year starts on October 1st.  *See* 26 U.S.C. § 9702(c).  However, the calculation for

the base year established by Congress, beginning July 1, 1991, is crucial, as it provides the basis for all

premium calculations going forward.  It is this base year calculation that is at issue in the parties'

motions for summary judgment.  After the initial calculation, the premiums are adjusted by taking the

initial calculation per beneficiary and multiplying the premium amount by the percentage of the medical

component of the Consumer Price Index that surpasses the medical component for 1992.  *See* 26

U.S.C. §9704 (b)(2)(B).

B.     The Combined Fund's Practices Relating to Reimbursements From Medicare

The controversy surrounding the correct base year reimbursement figure focuses on two

conflicting approaches to the term reimbursement.  The first approach is a capitation-based approach

to reimbursement, described below, which was actually in place during the base year established by 26

U.S.C. § 9704(b)(2)(A), which is July 1, 1991 to June 30, 1992.  The second approach, also

described below, is a cost-based approach to reimbursement that was in place prior to July 1, 1990.

The cost-based approach had been abandoned, in lieu of the capitation-based approach, by the base

year.  *See Holland*, 309 F.3d at 811; (Pls.' Mem. Summ. J. Ex. 3 at 4, 9.)

The term reimbursements, as it is used in the relevant section of the Coal Act, relates to

reimbursements the Combined Fund receives from Medicare.  The Combined Fund has a partnership

with Medicare.  Prior to July 1, 1990, the Combined Fund paid for Part B (physician) related medical

expenses for eligible beneficiaries and their dependents eligible to receive medical assistance from the

Medicare program.  The Combined Fund would then seek reimbursement from the Health Care

Financing Administration ("HCFA"), an agency within the SSA administering Medicare.  The HCFA

would provide the Combined Fund with reasonable cost-based reimbursements for services Medicare

covered under Part B.  *Id.*  This arrangement led to disputes between HCFA and the Combined Fund

due to the negotiating of reasonable cost-based Medicare reimbursements.  *Id.*

  In 1990, to try to eliminate these disputes, HCFA and the Combined Fund entered into a "risk-

capitation" agreement pursuant to which HCFA would pay the Combined Fund a fixed monthly per-

person fee instead of the reasonable cost-based amount.  *Id.*  From July 1, 1990 to June 30, 1993,

HCFA agreed to pay the Combined Fund a "predetermined amount per beneficiary per month which

was based on a prediction of the Plans' Medicare-covered expenditures."  (Def. Trustees' Mem.

Summ. J. at 10.)  The fixed monthly fee for the first year was $141.87.  (*Id*.)

  By the second year of the calculations (the baseline year for Coal Act premium calculations

started July 1, 1991), the Medicare flat fixed  monthly fee was $156.11.  (Def. Barnhart's Mem.

Summ. J. at 8.)  The flat fee or capitation calculation produced a $182.3 million payment owed by

HCFA to the Combined Fund.  However, the Combined Fund had actually only paid $156.8 million

for Medicare-covered services - - resulting in a $25 million surplus in the fund during the base year.

  C. The Initial 1993 Premium Decision

  In calculating the premium for the base year, the Secretary of Health and Human Services

("Secretary"), who was tasked with this calculation at the time, subtracted the reimbursements from the

aggregate amount of payments made by the Combined Fund.  On October 4, 1993, then-Secretary

Shalala issued a memorandum ("1993 Premium Decision") where she proffered two definitions of

reimbursement - one applying the cost-based approach and the other applying the capitation-based approach.[3]  The Secretary selected the cost-based approach.  In doing so, the Secretary used $156.8 million as the reimbursement figure instead of the $182.3 million amount the Combined Fund actually received from the HCFA for the base year under the capitation-based approach.  (Pls.' Mem. Summ J. at 5.)  The Secretary used the $156.8 million amount as the reimbursement figure because it represented the amount paid by the Combined Fund for Medicare Part B and administrative costs  - - resembling a cost-based methodology rather than a capitation-based basis computation of $182.3 million.  In using the figure of $156.8 million, the annual premium for coal operators for the following year was higher - - $2,245.33 versus $2,013.83 if the $182.3 million figure was used.  *See National Coal Ass'n*, 81 F.3d at 1080.  As discussed below, in brief, this premium determination prompted the first of a series of litigations concerning the premium calculation under the Coal Act.

III.    Prior Premium Rate Litigation

    A.    *National Coal Association* Litigation - (Coal Miners v. SSA)

    In 1994, the National Coal Association and seven coal companies ("*National Coal* Plaintiffs") filed a complaint in the United States District Court for the Northern District of Alabama against the Secretary alleging a violation of the Coal Act in response to the 1993 Premium Decision.[4]  *National*

---

[3] The Secretary's first definition defined "reimbursement" as the "amount the Combined Fund paid under a fee-for-service arrangement [which was $156.8 million]. (This option results in more money for the Combined Fund.)." (Pls.' Mem. Summ. J. Ex. 1 at 2.)  The Secretary's second definition defined "reimbursement" as "the Medicare capitated payments received by the fund [which was $182.3 million]. (This option results in less money for the Combined Fund.)." (*Id.*)

[4] The Trustees of the Combined Fund were not named as parties to this suit over the objection of the Secretary.  The Trustees declined to voluntarily intervene and participate in the Alabama litigaton. (Def. Barnhart's Mem. Summ. J. at 10.)

*Coal Ass'n*, 1995 U.S. Dist. LEXIS 2116, at *1.  The *National Coal* Plaintiffs moved for summary

judgment stating that the Secretary violated section 9704(b)(2) of the Coal Act by improperly

calculating the annual premiums each signatory coal operator must pay for each assigned beneficiary

including the interpretation of "reimbursement".  *Id.* at *11; *see* 26 U.S.C. § 9704(b)(2)(A)(i).  The

*National Coal* Plaintiffs argued that the term "reimbursement" should be the entire amount of money

paid by the HCFA to the Combined Fund according to the risk-capitation agreement with the

Secretary.  *Id.*  The Secretary argued her interpretation of the term "reimbursement" was accurate and

should be entitled to deference.  *Id.* at *12.

The Alabama district court held that the term "reimbursement" should be computed to include

the total amount of money the HCFA paid to the Combined Fund "regardless of whether such a

payment would be greater or less than the actual cost of Medicare expenses incurred by the UMWA

plans for Medicare Part B expenses."  *Id.* at *14.[5]  The now-Commissioner of the SSA appealed the

district court's decision to the United States Court of Appeals for the Eleventh Circuit, which affirmed

the lower court's ruling.  *National Coal Ass'n*, 81 F.3d at 1081-82.  The court held that the term

"reimbursement" referred to the entire amount of money HCFA paid to the Combined Fund and that

deference to the SSA's interpretation of reimbursement was not necessary since the statutory text of

---

[5] In a later memorandum opinion, the district court ordered the SSA to: (1)  recompute the annual premiums based upon the total payments made by HCFA to the 1950 and 1974 Benefit Plans for the plan year July 1, 1991 to June 30, 1992; (2) inform the Combined Fund of the premium amount the SSA should have determined for assigned operators for February 1, 1993 to October 1, 1993; and (3) apprise the Combined Fund of the annual premiums assigned operators should have paid for the plan year starting October 1, 1994.  *National Coal Ass'n v. Chater*, No. CV-94-H-780-S, 1995 U.S. Dist. LEXIS 21125, at * 1 (N.D. Ala. July 20, 1995).

the term "reimbursement" was clear. *Id.* at 1081-82.[6]  Significantly, the Commissioner did not seek

Supreme Court review.

B.       1995 Premium Decision

On July 28, 1995, the Commissioner notified the Trustees of the health premium amount

calculated in accordance with the *National Coal* decision.  ("1995 Premium Decisions) (Pls.' Mem.

Summ. J. Ex. 8.)  The 1995 Premium Decision used the total money HCFA paid to the Combined

Fund, $182.3 million, for the reimbursement figure, which resulted in a ten percent decrease in the

annual health premium amount charged to the coal operators.  (Pls.' Mem. Summ. J. at 12.)  From

1995 to 2003, the Commissioner calculated the annual health premium amounts uniformly to all

assigned operators in accordance with the 1995 Premium Decision.  (*Id.*)

C.       *Holland v. Apfel*

On July 26, 1996, two months after the Eleventh Circuit's decision in *National Coal*, the

Trustees, after having declined to intervene in the Alabama litigation, filed a complaint against the

Commissioner of the SSA, Kenneth S. Apfel in United States District Court for the District of

Columbia.  The Trustees claimed that the 1995 Premium Decision misinterpreted the Coal Act in

---

[6] After the *National Coal* decisions, the successor to the National Coal Association, the National Mining Association, filed a complaint against the Combined Fund demanding repayment for the difference of the annual health premium rates calculated by the SSA. *National Mining Ass'n v. Apfel*, No. CV-96-J-1385-S (N.D. Ala.).  In February 1999, the United States District Court for the Northern District of Alabama granted summary judgment in favor of the Plaintiff coal operators by requiring a refund of $35 million of their overpayments for health benefit premiums. *National Mining Ass'n v. Apfel*, 97 F. Supp. 2d 1070, 1083 (N.D. Ala. 1999).  In May 1999, the parties entered into a settlement agreement where the Combined Fund refunded the difference between the two rates for the first three years of the plan, but reserved its right to challenge the lower rates as a result of the *National Coal* decision.  (Def. Barnhart's Mem. Summ. J. Ex. 4.)

violation of section 706(2)(A) of the Administrative Procedure Act ("APA") for failing to be in

accordance with the law.  *See Holland v. Apfel*, 23 F. Supp. 2d 21, 26 (D.D.C. 1998) (denying

Commissioner's and Intervenors' motions to dismiss) (this action will be referred to as "Holland I").

The Commissioner and the intervenor-defendants, the *National Coal* Plaintiffs, argued that an

administrative agency does not act "arbitrarily and capriciously" when it adopts an interpretation based

upon the authoritative order of a United States District Court.  *Id.*  In 1998, the United States District

Court for the District of Columbia denied the motions to dismiss of the Commissioner and the

intervenor-defendants based primarily on the notion that judicial interpretation cannot override

congressional intent.  *Id.*

The D.C. District Court in *Holland I* denied the Trustees' and the *National Coal* Plaintiffs'

motions for summary judgment.  *Holland v. Apfel*, 96-9744 (CKK), 2000 U.S. Dist. LEXIS 6134, at

*22 (D.D.C. Feb. 25, 2000).  First, the D.C. District Court found that there were at least two

interpretations of the term "reimbursements," and, therefore, the statute was ambiguous.  Second, the

D.C. District Court found that the SSA's original interpretation (consisting of the $156.8 million HCFA

paid to the Combined Fund for Medicare expenses incurred ) was "permissible," an example of "fair

and considered judgment on the matter," and that the SSA's concern for the Combined Fund's actual

expenditure is "eminently reasonable."  *Id.* at *19-21.  The D.C. District Court issued an injunction

ordering the Commissioner to recalculate the health care premiums using the pre-Eleventh Circuit

interpretation of "reimbursements."  (Pls.' Mem. Summ. J. Appx. 8; *Holland v. Apfel*, No. 96-01744

(CKK) (D.D.C. Jan. 12, 2001).) However, the recalculation of health care premiums was stayed

pending any appeals. *(Id.)*

On appeal, the United States Court of Appeals for the District of Columbia held that the SSA's

1995 Premium Decision, pursuant to the Eleventh Circuit's decision in *National Coal,* was not

restricted from APA review simply because an injunctive order was issued by the Eleventh Circuit.

*Holland v. Apfel*, 309 F.3d 808, 810 (D.C. Cir. 2002).  The D.C. Circuit stated that the

Commissioner did not need to recalculate the health care premium for non-*National Coal* Plaintiffs.

*Id.*  Therefore, the D.C. Circuit found that it was permitted to review the 1995 Premium Decision

regarding its applicability to non-*National Coal* Plaintiffs.  *Id.*  The Commissioner was concerned that

the SSA was being asked to comply with two competing orders, but the D.C. Circuit explained that a

viable remedy was available to non-*National Coal* Plaintiffs avoiding conflict with the Eleventh

Circuit's decision since it applied only to *National Coal* Plaintiffs.[7]

In *Holland I*, the D.C. Circuit remanded the case for clarification as to the basis of the SSA's

issuance of the 1995 Premium Decision since the term "reimbursement" lacked a "plain meaning."  *Id.*

at 816, 819.  Ultimately, the court requested the SSA to explain whether the SSA felt it was forced to

adopt the Eleventh Circuit's interpretation of "reimbursement" nationwide.  *Id.*  at 816-17.  If the

agency felt it was compelled to apply the Eleventh Circuit's definition of "reimbursement" nationwide,

then *Chevron*[8] deference would not apply to the SSA since the nationwide application would be the

---

[7] The D.C. Circuit stressed that "[i]t is altogether possible for the Commissioner to calculate the premium twice, according to the two different interpretations of 'reimbursements,' and to apply the appropriate calculation to each coal operator, depending on whether the particular coal operator was or was not party to the Eleventh Circuit suit."  *Holland*, 309 F.3d at 814.

[8] *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984) (reiterating that administrative agencies statutory interpretations, pursuant to express or implied delegated authority by Congress, are given judicial deference, if the agency's interpretation is not arbitrary, capricious, or contrary to the statute).

reasoning of a court and not the administrative agency promulgated with those powers by Congress. *Id.* at 817.  Conversely, if the SSA "voluntarily acquiesced" and used its own reasoned judgment, then *Chevron* deference might apply.  *Id.*

In sum, the D.C. Circuit: (1) affirmed the lower court's denial of the motion to dismiss; (2) vacated the lower court's injunction concerning the recalculation of annual health care premiums for *National Coal* Plaintiffs; (3) vacated the 1995 Premium Decision because the SSA had failed to appropriately rationalize its decision to apply the *National Coal* decision to all coal operators nationwide; and (4) reversed the lower court's decision to support the SSA's original interpretation of the term "reimbursements" *pending clarification from the SSA.  See id.* at 819.

D.    2003 Premium Decision

On January 9, 2003, the D.C. District Court remanded the case to the SSA to address the questions posed by the D.C. Circuit.  (Pls.' Mem. Summ. J. at 16.)  On June 10, 2003, the SSA sent a letter to the chairman of the Trustees of the Combined Fund stating:

> After a diligent search, the Agency has been unable to locate documents that illuminate the rationale that provided the basis for the 1996 [sic] decision to publish a single per-beneficiary rate.  The officials involved in making the decision are no longer with the Agency, so there is no available "institutional memory" sufficient to determine whether the Agency voluntarily acquiesced in the Eleventh Circuit's interpretation or believed that it had no choice but to apply the revised interpretation nationwide.

(Pls.' Mem. Summ. J. Ex. 10 at 2.)

In this same June 10, 2003 letter, referred to as the 2003 Premium Decision, the Commissioner established a new, two-tiered premium calculation scheme.  Basically, the coal operators that were parties in the *National Coal* case would pay a lower premium calculation.  To reach this result, the

Commissioner explained that the SSA will define reimbursement, consistent with the Eleventh Circuit's

definition, to mean the payment received from HCFA, based on the capitation-based approach. The

remaining coal operators, that were not parties in *National Coal*, would pay a higher premium. This

higher premium was reached by defining reimbursement to mean a cost-based approach or the actual

amount the Combined Fund paid out in Medicare covered expenses. (Pl.'s Mem. Mot. Summ. J. Ex.

10 at 2.) The 2003 Premium Decision states, in relevant part:

> Accordingly, for the determination letter for the plan year beginning October 1, 2003,
> we intend to provide two per-beneficiary premium calculations. The higher amount will
> represent a calculation based on the initial interpretation of the term "reimbursement."
> We believe that this interpretation is consistent with the text and structure of the Coal
> Act as a whole and represents a permissible construction of the statute's plain language
> of the term "reimbursement." The lower amount will represent a calculation consistent
> with the interpretation established in National Coal. The establishment of two
> calculations will allow the Fund to apply the higher premium amount to those coal
> operators who were not parties to the National Coal litigation. The Agency believes
> that implementation of the Eleventh Circuit's decision in this manner, which enhances
> the financial viability of the UMWA Combined Benefit Fund, is consistent with the Coal
> Act's stated purpose of stabilizing plan funding and allowing for the provision of health
> care benefits to retired coal miners and their dependents.

(Pls.' Mem. Summ. J. Ex. 10 at 2.)

As mentioned above, Plaintiffs contend that this decision violates the plain language of the Coal

Act, 26 U.S.C. § 9704(b)(2)(A), which they believe requires the capitation-based approach to be used

to determine the reimbursement amount and that the SSA's determination violated the APA, in

particular 5 U.S.C. § 706(2)(A), because it was arbitrary and capricious and not in accordance with

the law. The SSA and the Trustees disagree.

IV      The Instant Litigation

On June 16, 2003, a number of assigned operators filed an action against the Commissioner

and the Trustees in the Northern District of Alabama, challenging the 2003 Premium Decision.  *A.J.*

*Taft Coal Co. v. Barnhart*, No. C.V. 03-BE-1390-S (N.D. Ala.).   On July 15, 2003, the Combined

Fund filed an action in the District of Columbia against more than 100 assigned operators seeking a

declaration that the defendants were required to pay the higher premium rate set forth in the 2003

Premium Decision.  *Holland v. A.J. Taft Coal Co.*, C.A., No. RJL-03-1523 (D.D.C.) (this action will

be referred to as "Holland II").  Both cases were transferred to this Court for resolution.  *See A.J. Taft*

*Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290 (N.D. Ala. 2003); *Holland v. A.T. Massey Coal*, 360

F. Supp. 2d 72 (D.D.C. 2004).  As explained above, the parties have agreed, and the Court has

approved, the use of this action, transferred from the Northern District of Alabama, to resolve the

parties' disputes.[9]  *Holland II* is not currently an active litigation and will likely be resolved by the

outcome of the instant action.

<u>STANDARD OF REVIEW</u>

This is an action for declaratory judgment[10] and injunctive relief.  Currently pending are cross-

motions for summary judgment.  Rule 56 of the Federal Rules of Civil Procedure provides that

summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no *genuine* issue as to any

*material* fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

56(c) (emphasis added).  In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), the Supreme

---

[9] This action has been appropriately re-captioned.

[10] "In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

Court explained that only "facts that might affect the outcome of the suit under the governing law" are

material. *Id. at* 248.  Moreover, a dispute over a material fact is *genuine* "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Id.*  The Court further explained that,

in considering a motion for summary judgment, a judge's function is limited to determining whether

sufficient evidence supporting a claimed factual dispute exists to warrant submission of the matter to a

jury for resolution at trial.  *Id*. at 249.  In that context, a court is obligated to consider the facts and all

reasonable inferences in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When both parties file motions for summary judgment, as here, the court applies the same

standards of review.  *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir. 1991); *ITCO*

*Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to

resolve genuine issues of material fact on a motion for summary judgment – even where . . . both parties

have filed cross motions for summary judgment.") (emphasis omitted), *cert. denied,* 469 U.S. 1215

(1985).  The role of the court is to "rule on each party's motion on an individual and separate basis,

determining, in each case, whether a judgment may be entered in accordance with the Rule 56

standard." *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.,* 627 F. Supp. 170, 172 (D. Md.

1985). "[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists

under the theory he is advancing, but he does not thereby so concede that no issues remain in the event

his adversary's theory is adopted." *Nafco Oil & Gas, Inc. v. Appleman,* 380 F.2d 323, 325 (10th

Cir. 1967); *see also McKenzie v. Sawyer,* 684 F.2d 62, 68 n.3 (D.C. Cir. 1982) ("neither party

waives the right to a full trial on the merits by filing its own motion.").  However, when cross-motions

for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "may be probative of the non existence of a factual dispute." *Shook v. United States,* 713 F.2d 662, 665 (11th Cir. 1983).

<u>DISCUSSION</u>

The parties in this case agree that there are no material facts in dispute, as to Counts One and Two of Plaintiffs' Second Amended Complaint, and that this matter can be decided on summary judgment.  Count One alleges that the Commissioner's June 10, 2003 decision ("2003 Premium Decision") altered the method used by the Commissioner to calculate annual premiums from 1995 to 2003 and in doing so violated the plain language of the Coal Act, 26 U.S.C. § 9704(b)(2)(A).  This Court is now placed in the position to essentially revisit whether the term "reimbursements", in 26 U.S.C. § 9704(b)(2)(A)(i) of the Coal Act, is ambiguous.  As the Northern District of Alabama noted in transferring this case to this District, "[t]here is a disagreement between the Eleventh Circuit and the D.C. Circuit as to whether or not the term 'reimbursements' is ambiguous." *Barnhart*, 291 F. Supp. 2d at 1299 (*comparing National Coal Ass'n*, 81 F.3d at 1081-82 (finding that "reimbursements" is unambiguous on its face and affirming the district court's mandate that the Commissioner apply the lower premium) *with Holland*, 309 F.3d at 816 ("If anything, the Eleventh Circuit's opinion seems to confirm the statute's ambiguity . . . . We can discern no plain meaning [of "reimbursements"] in this case, however.").

With respect to Count Two, the Plaintiffs claim that the 2003 Premium Decision violated the APA, in particular 5 U.S.C. § 706(2)(A), because the 2003 Premium Decision was arbitrary and capricious and not in accordance with the law.  However, the Commissioner argues that the SSA is

17

entitled to *Chevron* deference in determining the premium application and that the 2003 Premium

Decision was not arbitrary and capricious.  *See generally Chevron U.S.A., Inc.*, 467 U.S. at 837

(outlining a two-step process to determine whether an administrative agency's decision making is

entitled to deference).   The Eleventh Circuit and the D.C. Circuit are also in disagreement over this

issue.  The Eleventh Circuit found that deference to the SSA's interpretation of reimbursement was not

necessary since the statutory text of the term "reimbursement" was clear.  *National Coal Ass'n*, 81

F.3d at 1081-82.  The D.C. Circuit, determining that the definition of reimbursement was not clear,

found that *Chevron* deference may be applicable to the SSA's 2003 Premium Decision.

> The Court will address each Count in turn.

I.    Count I - The Term Reimbursements

> The Court is first presented with a pure question of statutory analysis, in that it must  determine

the meaning of the term "reimbursements" as it is used in 26 U.S.C. § 9704(b)(2)(A).[11]  Statutory

interpretation begins with the language of the act.  *See Bailey v. United States,* 516 U.S. 137, 142

(1995); *Dep't of Labor v. North Carolina Growers Ass'n*, 377 F.3d 345, 350 (4th Cir. 2004);

*United States v. Southern Mgmt Corp.*, 955 F.2d 914, 920 (4th Cir. 1992) (citing *Chevron*, 467

U.S. at 842-43).  The Court must determine whether the language has a plain and unambiguous

meaning with regard to the particular dispute.  *Barnhart*, 534 U.S. at 450.

---

[11] In this case, the type of pure statutory analysis required to address Count One of Plaintiffs' Complaint is virtually identical to the type of analysis required in the first step of *Chevron*, which is more directly implicated by Count Two of Plaintiffs' complaint.  *See Chevron*, 467 U.S. at 842-43.  Under the first part of the *Chevron* two-step process, the court must determine whether Congress has directly addressed the precise question at issue.  *Id.*  If the court feels the "unambiguously expressed intent of Congress" is clear, then the analysis ceases for the court and the agency since "that intention is the law and must be given effect."  *Id.* n.9.

The Coal Act does not define the term reimbursements, in § 9704(b)(2)(A), or elsewhere in the Act.  However, at the time the Coal Act was passed, in 1992, the practice of the Secretary of HHS and the Combined Fund was to calculate reimbursements using a capitation-based methodology.  This practice was memorialized in a Memorandum of Agreement dated September 25, 1990 and a subsequent Contract dated January 13, 1992.  (Pls.' Mem. Summ. J. Exs. 4 & 5.)  The Contract under the heading "Reimbursement" states, "[p]ursuant to waivers . . . the [Combined Fund] will be reimbursed on a risk-based capitated payment basis for a period of 3 years, beginning July 1, 1990 and ending June 30 1993."  (Pls.' Mem. Summ. J. Ex 5.)  The capitation-based approach was in fact used for the base year (July 1, 1991 to June 30, 1992) established by Congress in § 9704(b)(2)(A).[12]

In appropriate circumstances, courts will presume that Congress was aware of certain facts or practices in place at the time a statute was enacted.  *See Mori v. International Broth. of Boilermakers*, 653 F.2d 1279, 1282 (9th Cir. 1981), *cert. denied*, 454 U.S. 1147 (1982) (citing *Ranes v. Office Employees Union, Local 28*, 317 F.2d 915 (7th Cir. 1963)).  In 1991, Congress became aware of the capitation-based calculation of reimbursement.  In the Coal Commission's report to Congress, the Commission explained that in late September of 1990 the Combined Fund and Medicare were "moving toward a capitated reimbursement arrangement for FY 1991 and the future."  (Pls.' Mem. Summ. J. Ex. 20; *Coal Commission Report on Health Benefits of Retired Coal Miners: Hearing Before the Subcomm. on Medicare and Long-Term Care of the Senate Comm. on Finance*, 102nd Cong. 198-99 (1991)).  The Report went on to explain that "[u]nder the capitation

---

[12] It is also noteworthy that at no time after the Eleventh Circuit *National Coal* decision, which was issued almost ten year ago, did Congress choose to act to indicate that the capitation-based approach was inconsistent with its intended meaning of the term "reimbursements."

arrangement, the Funds are to be paid a predetermined amount per member per month . . . ." *Id.*

Therefore, Congress was aware that the reimbursement to the Combined Fund was being calculated

based on the capitation-based methodology when it passed the Act in 1992.  Furthermore, Congress

specifically set the year beginning July 1, 1991 as the base-year knowing that the capitation-based

reimbursement arrangement was being implemented during that year.

Notwithstanding Congress' level of awareness of the capitation-based approach, the ordinary,

contemporary, and plain meaning of reimbursements is consistent with the capitation-based approach.

In interpreting the plain language of a statute, "[w]e give the words of a statute their ordinary,

contemporary, common meaning, absent an indication Congress intended them to bear some different

import." *North Carolina Growers Ass'n*, 377 F.3d at 350 (quoting *Williams v. Taylor,* 529 U.S.

420, 431 (2000)).  Dictionary definitions of statutory words that express commonly accepted meaning

deserve some weight in the interpretive process.  *See United States v. Jackson*, 759 F.2d 342, 344

(4th Cir. 1985).  Plaintiffs' cite *Webster's Third New International Dictionary*, which defines

reimburse as follows:  "1: to pay back (an equivalent for something taken, lost or expended) to

someone." *Webster's Third New International Dictionary* 1914 (1986).  The SSA cites a number

of dictionary definitions including, *The Random House Dictionary*, which defines reimburse as follows:

"1. to make repayment to for expense or loss incurred: *The insurance company reimbursed him for*

*his losses in the fire* 2. to pay back, refund, repay." *The Random House Dictionary of the English*

*Language* 1625 (2d ed. Unabridged 1987) (1980).  *Black's Law Dictionary* defines reimbursement

simply as "1. Repayment. 2. Indemnification."

Consistent among all of these definitions is that a reimbursement is essentially a payment made.

20

The SSA argues that the notion of repayment means that the recipient is only provided the amount he or she expended.  The common meaning of reimbursement, however, is not as narrow as the SSA suggests.  Therefore, the capitation-based payment of $182.3 million made by HCFA to the Combined Fund during the base year squarely falls within the common meaning of the term reimbursement.  "If the words convey a clear meaning, courts may not sift through secondary indices of intent to discover alternative meanings." *Southern Mgmt. Corp.*, 955 F.2d at 920.

The Trustees, however, invite this Court to take a more holistic approach in conducting the statutory interpretation necessary to resolve this dispute.  The Trustees cite *Regions Hosp. v. Shalala*, 522 U.S. 448 (1998) to illustrate that special care must be given to base year calculations to ensure that mistakes are not perpetuated on an ongoing basis.[13]  In *Regions*, however, there was a determination that there were "misclassified" and "nonallowable costs" included in a base year calculation.  *Id.* at 457-59.  The Trustees caution that allowing the capitation-based amount to serve as the base year determination will "perpetuate[] a multi-million dollar mistake."  (Trustees' Mem. Summ. J. at 26.)  Although both *Regions* and the instant litigation involve base year calculations, there is no contention that there were administrative mistakes in calculating the capitation-based reimbursement payment agreed to by the Combined Fund and HHS.  Furthermore, the statutory interpretation task at hand does not permit this Court to pass judgment on which calculation approach may be better.  To the extent that the Trustees are suggesting that Congress made some type of mistake in using the term reimbursement or selecting a certain base-year, it is not within this Court's authority to correct any such

---

[13]     The SSA also cites *Regions Hosp.* in its brief.

"mistake."

Similarly, the SSA invites the Court to look at the statutory purpose of the Coal Act to determine the meaning of the term "reimbursements."  *See United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) (noting that interpretation of a statute is a "holistic endeavor").  The SSA places importance on the fact that the base year calculation will affect all future premium payments and, as a result, the base year determination impacts the ability of the Combined Fund to deliver benefits at the level intended by Congress.  However, this Court, in conducting statutory interpretation, cannot be motivated by factors outside the unambiguous text of a statute.  It is for Congress to decide the level of benefits to be delivered by the Combined Fund and, if Congress believes that it is necessary, it has the authority to change statutory language to ensure that its objectives are accomplished.

The Commissioner's 2003 Premium Decision violates the plain language of the Coal Act, 26 U.S.C. § 9704(b)(2)(A), in that the Commissioner established two different definitions of reimbursement, one based on a cost-based amount, reflecting costs incurred, and a second based on a capitation-based amount, reflecting the amount received.  This Court concurs with the analysis conducted *ten years ago* by the United States District Court for the Northern District of Alabama that "the term reimbursement clearly and unambiguously refers to the *full amount paid* . . . in the base year pursuant to the *capitation* agreement."  *National Coal Ass'n*, 1995 U.S. Dist. LEXIS 21116, at *4 (emphasis added).  This definition had been applied prior to the passage of the Coal Act.  Furthermore, such a definition was uniformly applied from 1995 until 2003, until modified in response to the Holland I litigation.  In addition, Congress has never taken any steps to alter the definition in the aftermath of the

*National Coal* litigation or the application of the capitation-based amount for a period of eight years.

In a review of legislative history and general purpose of the Act, the United States Court of Appeals for

the Eleventh Circuit appropriately noted that the "ordinary meaning of the term 'reimbursement' is not

restricted by any requirement that such payments be dollar-for-dollar what the reimbursed party paid

out," but "refers to the entire amount of the capitation payments that were made." *National Coal*

*Ass'n*, 81 F.3d at 1081-82.  Accordingly, reimbursement must be defined as the actual amount paid by

HCFA to the Combined Fund in the base year.  Therefore, judgment shall be entered in favor of the

Plaintiffs on Count One.

II      Count II - APA Analysis

This Court finds the statutory text of § 9704(b)(2) clear, thus deference analysis is not

necessary.  *See Chevron U.S.A., Inc.*, 467 U.S. at 842-843; *see also Edelman v. Lynchburg*

*College*, 535 U.S. 106, 114 n.8 (2002).  However, due to the long-standing dispute concerning the

statutory interpretation of § 9704(b)(2) of the Coal Act and the prior protracted litigation, this Court

will entertain the possibility that deference applies.[14]

Assuming *arguendo* that "reimbursements" in 26 U.S.C. § 9704(b)(2)(A) is ambiguous,  this

Court must review the SSA's 2003 Premium Decision in accordance with the APA.  *See* 5 U.S.C. §

706(2)(A).  To review agency determinations, courts frequently apply the well-known analysis

---

[14] The United States District Court for the Northern District of Alabama and the United States
Court of Appeals for the Eleventh Circuit held the statutory text of § 9704(b)(2) was clear and found it
unnecessary to address whether the then-Secretary's interpretation was reasonable and entitled to
deference.  *See National Coal Ass'n*, 81 F.3d at 1082; *National Coal Ass'n*, No. CV-94-H-780-S, 1995
U.S. Dist. LEXIS 21116, at *18.

established in *Chevron*.[15]  Under *Chevron*, if Congress has explicitly or implicitly delegated authority

to an agency "to elucidate a specific provision of the statute by regulation" then the agency's

determination shall not be disturbed by the reviewing court unless it is arbitrary or capricious.

*Chevron*, 467 U.S. 843-44; *see also* Administrative Procedure Act, 5 U.S.C. § 706(2)(A); *United*

*States v. Mead Corp.*, 533 U.S. 218, 227 (2001).

　　　More recently, the Supreme Court in *United States v. Mead*, 533 U.S. 218 (2001) has

clarified when *Chevron* deference is appropriate.  In *Mead*, the Supreme Court held that

"administrative implementation of a particular statutory provision qualifies for *Chevron* deference when

it appears that Congress delegated authority to the agency generally to make rules carrying the force of

law, and that the agency interpretation claiming deference was promulgated in the exercise of that

authority."  *Id.* at 226-27.  Therefore, before conducting a *Chevron* deference analysis, this Court must

first determine whether *Chevron* deference is even appropriate.[16]  If *Chevron* deference is not

appropriate, *Mead* suggests that the agency's decision is still entitled to respect based on its

persuasiveness.  *See Mead*, 533 U.S. at 234-35.

---

[15] *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

[16] Under *Chevron* analysis, when a court reviews an agency's construction of a statute it regulates, the court shall perform a two-step process.  *Chevron U.S.A., Inc.*, 467 U.S. at 842-43.  First, the court must determine whether Congress has directly addressed the precise question at issue.  *Id.*  If the court feels the "unambiguously expressed intent of Congress" is clear, then the analysis ceases for the court and the agency since "that intention is the law and must be given effect."  *Id.*  If the reviewing court finds that Congress has not spoken to the precise question at issue by being silent or ambiguous, thus conferring implied delegated authority to the agency on interpretation of the regulation, then the reviewing court must determine whether the agency's interpretation or attempt to fill the gap or clarify ambiguity is based on a permissible construction of the statute.  *See id.* at 843; *United States v. Deaton*, 332 F.3d 698, 708-9 (4th Cir. 2003), *cert. denied*, 541 U.S. 972 (2004).

This Court finds that the SSA's 2003 Premium Decision would not be entitled to *Chevron* deference, as Congress did not delegate the type of authority necessary to afford the SSA's decision such deference.  In establishing the standards of deference in *Chevron* noted above, the Supreme Court further stated:  "We have recognized a very good indicator of delegation meriting *Chevron* treatment in express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed."  *Id.* at 229.  The SSA correctly notes that the delegation of notice-and-comment rulemaking authority is not a prerequisite to *Chevron* deference.  *See Barnhart v. Walton*, 535 U.S. 212, 221-22 (2002).  However, the 2003 Premium Decision was simply a letter from SSA to the Trustees of the Combined Fund informing them of the SSA's per-beneficiary health benefit premium calculations.  There is no indication that this single letter was promulgated under authority delegated by Congress to have the force of law.  Indeed, the Supreme Court in *Christensen v. Harris County*, 529 U.S. 576 (2000) addressed the precise question of the deference to be accorded to an opinion letter.  The Supreme Court specifically noted that:  "[W]e confront an interpretation contained in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking.  Interpretations such as those in opinion letters -- like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law -- do not warrant *Chevron*-style deference."  *Id.* at 587; *see also EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 256-58 (1991).  Therefore, the Court will determine the level of deference to be accorded to the 2003 Premium Decision in light of the analysis set forth in *Mead*.

According to *Mead*, an agency's interpretation may merit some form of deference other than

*Chevron* deference. 533 U.S. at 234.   Further, interpretations not made under the protocol of the

APA are still entitled to respect if the agency's interpretation has the power of persuasion.

*Christensen*, 529 U.S. at 587.

> We consider that the rulings, interpretations, and opinions of the Administrator under
> this Act, while not controlling upon the courts by reason of their authority, do constitute
> a body of experience and informed judgment to which courts and litigants may properly
> resort for guidance. The *weight of such a judgment in a particular case will
> depend upon the thoroughness evident in its consideration, the validity of its
> reasoning, its consistency with earlier and later pronouncements, and all those
> factors which give it power to persuade*, if lacking power to control.

*Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (emphasis added); *see also Mead*, 533 U.S. at

221.  In applying the *Skidmore* factors to the present case it is evident that the SSA's 2003 Premium

Decision should be according little weight.

The 2003 Premium Decision adopted a two-tiered premium structure by applying two different

definitions of the term reimbursement.  As a result, certain coal operators, who were not parties to the

*National Coal* litigation initiated in Alabama, pay a higher premium than those who were parties in that

litigation.  As has been discussed at length previously, *see infra* "Background," this structure was not

always in place.  The SSA abandoned its 1993 premium calculation methodology[17] in 1995,[18] and then

adopted the 2003 Premium Decision, a hybrid between the 1993 and 1995 decisions.  It is certainly

difficult to catagorize the SSA's pronouncements as consistent.  The United States Court of Appeals

---

[17] In the 1993 Premium Decision, the then-Secretary interpreted the term "reimbursements" to include the amount of actual costs incurred by the Combined Fund rather than the amount of money received from HCFA.  This approach was applied uniformly to all coal operators.

[18] In the 1995 Premium Decision, the term "reimbursements" was defined as the amount of money received from HCFA.  This approach was applied uniformly to all coal operators.

for the Fourth Circuit has specifically stated that less deference is given "to an agency's interpretations of a statute that conflict with the agency's previous interpretations of that same statute." *Nish v. Cohen*, 247 F.3d 197, 205 (4th Cir. 2001) (quoting *Credit Union Ins. Corp. v. United States*, 86 F.3d 1326, 1332 (4th Cir. 1996)).

In its three page letter to the Trustees of the Combined Fund (the "2003 Premium Decision"), the SSA cannot provide a rational basis for abandoning the prior single per-beneficiary rate for all coal operators utilizing the capitated calculation for reimbursements.  (*See* Pls.' Mem. Summ. J. Ex. 10, "2003 Premium Decision".)  Although the SSA was unable to "establish the rationale for [its] decision in the past," it determined that "it is now appropriate to adopt a different approach in light of recent litigation and the current financial condition of the Fund." (*Id*. at 2.)  The SSA explained that it was not required to apply the holding of the Eleventh Circuit to non-*National Coal* plaintiffs and that this reason coupled with the Combined Fund's worsening condition made it necessary to "afford[] all the premium revenues contemplated by the Coal Act." (*Id.*)  The SSA does not provide any other rationale for why certain coal operators should be required to bear more financial burden than others.  Although this Court appreciates the SSA's concern for the financial viability of the Combined Fund, it cannot accept that this reason supports applying two different definitions of reimbursement, which results in certain coal operators being required to carry more of the financial load.[19]  Therefore, this Court will accord little deference to the SSA's 2003 Premium Decision.  The definition of reimbursements must be

---

[19] Even if this Court were to apply the heightened level of deference required under *Chevron*, it would conclude that the SSA's 2003 Premium Decision was arbitrary and capricious for these same reasons.  *See Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 158 (3d Cir. 2004) ("The Secretary's restrictive interpretive rule is arbitrary and capricious because it contradicts the plain language of the rule, has not been applied consistently, and is unreasonable.").

uniformly applied to all coal operators in accordance with the term's plain meaning, as determined above.

CONCLUSION

For the reasons stated below, the Plaintiffs' Motion for Summary Judgment on Counts One and Two is GRANTED,  Defendant Barnhart's Motion for Summary Judgment on Counts One and Two is DENIED, and Defendant Trustees' Motion for Summary Judgment on Counts One and Two is DENIED.  A separate Order will follow.


/s/_____
Dated: August 11, 2005                                        Richard D. Bennett
                                                             United States District Judge